MAD

# UNITED STATES DISTRICT COURT
for the
Southern District of California

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

    Black Apple iPhone
Seized as FP&F No. 2023565800001903 Line Item 0001
        ("Target Device 2")

)
)
)
)
)
)
)

Case No.  '23  MJ0323

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2, incorporated herein by reference.

located in the ___ **Southern** ___ District of ___ **California** ___ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 8, U. S. C. § 1324     Alien Smuggling | |

The application is based on these facts:

See Attached Affidavit of Border Patrol Agent Giancarlo Lugo, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Giancarlo Lugo, Border Patrol Agent, U.S. Border Patrol
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ **telephone** _____ *(specify reliable electronic means)*

Date: ___ 01/27/2023 ___

_____
*Judge's signature*

City and state:  San Diego, California

HON. Andrew G. Schopler, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A-2

### PROPERTY TO BE SEARCHED

The following property is to be searched:

Black Apple iPhone
Seized as FP&F No. 2023565800001903 Line Item 0001
**("Target Device 2")**

Target Device is currently in the custody of the Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

13

## ATTACHMENT B

### ITEM TO BE SEIZED

Authorization to search the cellular telephones described in Attachments A-1, A-2 and A-3 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephones will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of **December 25, 2022, through January 25, 2023**:

a.      tending to indicate efforts to smuggle aliens from Mexico into the United States; and transport aliens inside the United States;

b.      tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c.      tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

d.      tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e.      tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

f.      tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which is evidence of violations of Title 8, United States Code, Section 1324.

15

## AFFIDAVIT

I, Giancarlo Lugo, being duly sworn, hereby state as follows:

## INTRODUCTION

1.     I submit this affidavit in support of an application for warrants to search the following electronic devices:

> White Apple iPhone
> Seized as FP&F No. 2023565800001901 Line Item 0004
> (**"Target Device 1"**)
>
> Black Apple iPhone
> Seized as FP&F No. 2023565800001903 Line Item 0001
> (**"Target Device 2"**)
>
> Green Samsung Cell Phone
> Seized as FP&F No. 2023565800001902 Line Item 0001
> (**"Target Device 3"**)

the **"Target Devices"**, as further described in Attachments A-1, A-2, A-3, and to seize evidence of crime, specifically, violations of Title 8, United States Code, Section 1324 (Alien Smuggling), as further described in Attachment B.

2.     The requested warrant related to the investigation and prosecution of Solvenetzin MOJICA Diaz, Jose Luis MERAZ Mendoza, and Martin SOLIS-Gonzalez for conspiracy to transport and move illegal aliens within the United States. The **Target Devices** are currently in the custody of Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

3.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents.  This affidavit is intended to show that there is sufficient probable cause for the requested warrants and does not purport to set forth all my knowledge of the investigation into this matter.  Dates and times are approximate.

## TRAINING AND EXPERIENCE

4.      I have been employed by the USBP since 2008 and am currently assigned to the San Diego Sector Prosecutions Unit. I graduated from the Border Patrol Basic Academy at the Federal Law Enforcement Training Center in Artesia, New Mexico. I am a Federal Law Enforcement Officer within the meaning of Rule 41(a)(2)(C), Federal Rules of Criminal Procedure and have been a Federal Law Enforcement Officer for 14 years.  I am authorized by Rule 41(a) Federal Rules of Criminal Procedure to make applications for search and seizure warrants and serve arrest warrants.  I have experience and have received training with respect to conducting investigations of immigration and criminal violations of Titles 8, 18, 19, and 21 of the United States Code.

5.      My current duties involve the preparation of criminal and administrative cases for prosecution, including the use of linking related subjects and information via electronic equipment and telephones. In the course of my duties, I investigate and prepare for prosecution cases against persons involved in the inducement, transportation, and harboring of illegal aliens into and within the United States; and, the utilization of illegally-obtained, counterfeit, altered or genuine immigration documents by illegal aliens to illegally gain entry or remain in the United States.

6.      During my tenure as a Border Patrol Agent, I have participated in the investigation of a number of cases involving the smuggling of aliens from Mexico into the United States and transportation of illegal aliens within the United States, which have resulted in the issuance of arrest warrants, search warrants, seizure warrants, and the indictments of persons for alien smuggling, including drivers, passengers, and guides.

7.      Through the course of my training, investigations, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of alien smugglers and alien transporters, in particular those who attempt to smuggle aliens into the United States from Mexico and transport them throughout the Southern District of California.  I am aware that it is a common practice for alien smugglers to work

2

1  in concert with other individuals and to do so by utilizing cellular telephones to maintain

2  communications with co-conspirators and/or illegal aliens in order to further their criminal

   activities.  Because they are mobile, the use of cellular telephones permits alien smugglers

3  and transporters to easily carry out various tasks related to their smuggling activities,

4  including, *e.g.*, remotely monitoring the progress of the aliens while the aliens are in transit,

   providing instructions to transporters, guiding aliens to specific pick up locations, warning

5  accomplices about law enforcement activity in the area and the status of check-point

6  operations, and communicating with co-conspirators who guide aliens, coordinate drop off

7  locations, and/or operate alien stash houses.

8          8.      The smuggling of aliens generates many types of evidence, including, but not

   limited to, cellular phone-related evidence such as voicemail messages referring to the

9  arrangements of travel, names, photographs, text messaging (via SMS or other

10 applications), and phone numbers of co-conspirators and illegal aliens.  For example,

   drivers and passengers responsible for transporting illegal aliens are typically in telephonic

11 contact with co-conspirators immediately prior to and/or following the crossing of the

12 illegal aliens at the border, at which time they receive instructions, including where to pick-

13 up the illegal aliens for transportation into the United States and where to take the illegal

14 aliens after crossing into the United States.  These communications may also include

   locations for delivery to stash houses and/or sponsors.  Illegal aliens also are typically in

15 telephonic contact with co-conspirators prior to and following their crossing in order to

16 make smuggling arrangements, receive instructions, and report their locations after

17 crossing. It is common for alien smugglers to be in contact with co-conspirators weeks to

   months in advance of an event to recruit drivers and to coordinate the event. It is also

18 common for co-conspirators to continue to contact each other by phone calls, social media,

19 or messaging applications when contact is lost with the driver after an apprehension has

20 occurred.

21

9.      Based upon my training, experience, and consultations with law enforcement officers experienced in human smuggling investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data.  In particular, in my experience and consultation with law enforcement officers experienced in alien smuggling investigations, I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

10.     This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

     a. tending to indicate efforts to smuggle aliens from Mexico into the United States, and transport aliens inside the United States;

     b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

     c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

     d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

     e. tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

4

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

11. On January 25, 2023, Supervisory Border Patrol Agent L. Borden, Border Patrol Agents C. Camacho, A. Field, A. Djokich, and C. Nelson, were performing assigned duties in the Imperial Beach Border Patrol Station's area of responsibility. Agents Borden, Camacho, Field and Djokich, were dressed in plain civilian clothes, wearing their Border Patrol issued outer body armor with badges and insignia fully visible.

12. At approximately 7:35 PM, Imperial Beach Border Patrol Station scope operator Border Patrol Agent A. Martinez observed a personal watercraft (PWC) traveling north from the International Maritime Boundary Line. As the PWC was heading towards Imperial Beach, Agent Martinez relayed his observations to the Joint Harbors Operation Center Operator (JHOC) via service radio. JHOC operator were able to obtain observation of the PWC and advised agents when it beached near the intersection of Seacoast Drive and Carnation Avenue. Agent Nelson responded to the area and and observed an individual along the shoreline. Agent Nelson approached the individual identified himself as a Border Patrol Agent and conducted an immigration inspection. The individual, later identified as material witness Manuel De Jesus VAZQUEZ Hernandez, stated that he is a citizen and national of Mexico without immigration documents that would allow him to enter or remain in the United States legally. At approximately 7:45 PM, Agent Nelson placed VAZQUEZ under arrest. This area is located approximately five miles west of the San Ysidro, California Port of Entry and approximately two and a half miles north of the United States/Mexico International Boundary.

13. Moments later, JHOC observed another PWC drop off another individual at the same location. Agent Nelson approached the individual identified himself as a Border Patrol Agent and conducted an immigration inspection. The individual, later identified as

5

material witness Rodolfo OTERO-Rosas, stated that he is a citizen and national of Mexico without immigration documents that would allow him to enter or remain in the United States legally.  At approximately 8:00 PM, Agent Nelson placed OTERO under arrest. This area is located approximately five miles west of the San Ysidro, California Port of Entry and approximately two and a half miles north of the United States-Mexico international boundary.

14.    During the event, Agent Cesar Camacho observed a silver four door Lexus driving back and forth on Seacoast Drive near where the PWC events were taking place. Agent Borden responded to the area and parked on Seacoast Drive and Calla Ave and observed an individual jogging past his location.  Agent Borden followed the individual and made contact with the individual later identified as the defendant Martin SOLIS-Gonzalez. Agent Borden approached SOLIS, identified himself as a United States Border Patrol Agent and conducted an immigration inspection.  SOLIS stated that he is a citizen and national of Mexico without immigration documents that would allow him to enter or remain in the United States legally.  Agent Borden notified Agent Camacho via his government cell phone that his field encounter with SOLIS revealed that SOLIS was dropped off by two friends in a silver sedan.  At approximately 8:30 PM, Agent Borden placed SOLIS under arrest for Alien Smuggling.

15.    At the time of arrest, a green Samsung Cell Phone (**Target Device 3**), was found on SOLIS' possession. SOLIS claimed ownership of the **Target Device 3**. This device was subsequently seized.

16.    While this encounter was taking place, Agent Camacho followed a silver Lexus to a McDonald located at the 1100 block on Palm Avenue in Imperial Beach, California. Agents Field and Djokich arrived on scene to assist Agent Camacho.  Agents Camacho, Field and Djokich decided to conduct a field interview with the two individuals as they exited the McDonalds.  Agent Djokich approached the individual, later identified as the defendant Jose Luis MERAZ Mendoza and conducted an immigration inspection.

6

MERAZ stated that he is a citizen and national of Mexico without immigration documents that would allow him to enter or remain in the United States legally.  At approximately 8:50 PM, Agent Djokich placed MERAZ under arrest.

17.    At the time of arrest, a black Apple iPhone (**Target Device 2**), was found on MERAZ' possession. MERAZ claimed ownership of the **Target Device 2**. This device was subsequently seized.

18.    Agents Camacho and Field approached the driver, later identified as the defendant, Solyenetzin MOJICA Diaz and identified themselves as Border Patrol Agents. MOJICA appeared to be nervous when approached by Border Patrol Agents.  Camacho conducted a brief investigation with MOJICA. When MOJICA was asked if he had any identification, he presented a Lawfully Admitted Permanent Resident card (LAPR).  Agent Djokich requested record checks MOJICA's LAPR card and determined that MOJICA was involved and arrested in an alien smuggling event a day prior.  At approximately 8:50 PM, Agent Camacho arrested MOJICA.  During a search incident to arrest, Agents found a loaded firearm under the driver seat.

19.    At the time of arrest, a white Apple iPhone (**Target Device 1**) was found MOJICA's possession. MOJICA claimed ownership of the **Target Device 1**. This device was subsequently seized.

20.    MERAZ was read his Miranda Rights. MERAZ stated that he understood his rights and was willing to answer questions without a lawyer present.  MERAZ stated that he crossed on or about November of 2022 and had recently moved to Anaheim, California where he met "Cholo" later identified as defendant MOJICA.  MERAZ claimed that on the day of the event, MOJICA contacted him an asked if he would like to accompany him to the Jamul Casino, in Jamul, California.  MERAZ stated that he had previously gone with MOJICA to Jamul Casino.  After driving briefly, MERAZ claimed that he asked MOJICA to go eat, at which point, MOJICA drove him to eat a hamburger.  MERAZ stated that he

7

1  was contacted by Border Patrol Agents shortly after.  MERAZ denied being involved in
2  alien smuggling activities.

3  21.    SOLIS was read his Miranda Rights. SOLIS stated that he understood his
   rights and was willing to answer questions without a lawyer present.  SOLIS claimed he
4  crossed illegally by himself and currently lives out of his blue Honda sedan.  SOLIS stated
5  that he recently heard from a co-worker, that "MOJICA" later identified as defendant
   Solyenetzin MOJICA Diaz and "Jose" later identified as defendant Jose Luis MERAZ
6  Mendoza were looking for help from someone to "keep an eye out" and be a lookout for
7  anything "passing."    SOLIS claims that MOJICA and MERAZ approached him
8  approximately two weeks ago and offered him the job.  SOLIS stated that on the morning
   of the smuggling event, MOJICA informed him to be ready to work.  SOLIS stated that at
9  the end of the workday, he was picked up by MOJICA and MERAZ in a grey four-door
10 sedan and was dropped off near the pier.  SOLIS was informed to walk up and down the
11 streets and observe for Border Patrol units in the area.  SOLIS was unsure how much he
   was to be paid however, he claimed that MOJICA informed him they would be paying him
12 to provide him some financial relief.

13 22.    Material Witness's OTERO and VAZQUEZ stated that they are citizens and
14 nationals of Mexico.  OTERO and VAZQUEZ stated they were to pay between $12,500
   USD and $100,000 MXN to be smuggled into the United States.  OTERO and VAZQUEZ
15 stated a number associated to the moniker "Mujica" was added to their cell phones.
16 VAZQUEZ said the person known by the name "Mujica," which was on his phone, was
17 the person he was apprehended with at a Border Patrol Checkpoint a few days prior.
   "Mujica" was the driver, who was illegally smuggling VAZQUEZ to Los Angeles,
18 California on that occasion.

19 23.    Based upon my experience and training, consultation with other law
20 enforcement officers experienced in human trafficking investigations, and all the facts and
   opinions set forth in this affidavit, I believe that telephone numbers, contact names,
21

8

electronic mail (email) addresses, appointment dates, messages, pictures, and other digital information are stored in the memory of the **Target Devices**. In light of the above facts and my experience and training, there is probable cause to believe that the defendants, Solvenetzin MOJICA Diaz, Jose Luis MERAZ Mendoza, and Martin SOLIS-Gonzalez, was using the **Target Devices** to communicate with others to further illegal entry into the United States. Based on my training and experience, it is also not unusual for individuals, such as the defendants, Solvenetzin MOJICA Diaz, Jose Luis MERAZ Mendoza, and Martin SOLIS-Gonzalez, to attempt to minimize the amount of time he was involved in smuggling activities, and for the individual to be involved for weeks and months longer than he claims. Accordingly, I request permission to search the **Target Devices** for data beginning on **December 25, 2022, through January 25, 2023**.

## METHODOLOGY

24.     It is not possible to determine, merely by knowing the cellular telephones' make, model and serial number, the nature and types of services to which the devices are subscribed and the nature of the data stored on the devices. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the devices may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device.

25.     Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if

some of the stored information on the devices may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the devices manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

26. Following the issuance of these warrants, a case agent familiar with the investigation will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephones and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of these warrants.

27. Based on the foregoing, identifying and extracting data subject to seizure pursuant to these warrants may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days from the date this warrant is signed, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

28. Law enforcement has not previously attempted to obtain the evidence sought by this warrant.

## CONCLUSION

29. Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Device** will yield evidence of alien smuggling violation of Title 8, United States Code, Sections 1324.

30. Because the **Target Devices** was seized at the time of Solvenetzin MOJICA Diaz, Jose Luis MERAZ Mendoza, and Martin SOLIS-Gonzalez' arrests; and have been securely stored since that time, there is probable cause to believe that such evidence

1  continues to exist on the **Target Devices**. As stated above, I believe that the appropriate

2  date range for this search is from **December 25, 2022, through January 25, 2023.**

    31.    Accordingly, I request that the Court issue a warrant authorizing law

3  enforcement to search the items described in Attachments A-1, A-2, A-3, and seize the

4  items listed in Attachment B using the above-described methodology.

5  I swear the foregoing is true and correct to the best of my knowledge and belief.

6

7

          Giancarlo Lugo

8            Border Patrol Agent

9  Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1

10  by telephone on this 27th day of January 2023.

11

12  Hon. Andrew G. Schopler

13  United States Magistrate Judge

14

15

16

17

18

19

20

21